*1186 ATTORNEY DISCIPLINARY PROCEEDINGS
1,PER CURIAM.
This disciplinary matter arises from one count of formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Ray Charles Harris, a currently suspended attorney.
FORMAL CHARGES
On November 13, 2000, this court sus the practice of law for a period of eighteen months. In re: Harris, 00-1825 (La.11/13/00), 774 So.2d 963 (“Harris I”). The formal charges in Harris I stemmed from respondent’s representation of his client, Robert Haynes, in a criminal case. After Mr. Haynes was convicted, he retained respondent to represent him on appeal. Respondent advised Mr. Haynes that he would handle the appeal pro bono, provided that Mr. Haynes paid for the transcript of the criminal trial. In 1996 and 1997, respondent received a total of $1,100 from Mr. Haynes’ mother, Patricia Haynes, to pay for the trial transcript. Respondent did not place these funds in a trust account, as required by the Louisiana Rules of Professional Conduct, nor did he complete Mr. Haynes’ appeal. Consequently, after investigating the complaints filed by Mr. Haynes and his mother, the ODC filed formal charges in Harris I on November 21, 1997. The matter was scheduled for a hearing on the merits on July 22, 1998. Shortly before that hearing, respondent forwarded to Mr. Haynes and his mother correspondence threatening civil action if they testified against him in the disciplinary proceedings.
l?In defense of the formal charges relating to respondent’s failure to place in trust the funds paid to him by Mrs. Haynes, respondent asserted that when he received each payment,[1] he purchased a money order and placed it in Mr. Haynes’ file for safekeeping. Respondent claimed at the hearing in Harris I that he had already returned Mrs. Haynes’ money orders to her by certified mail; however, he introduced into evidence photocopies of seven blank, undated money orders, all of which he said he purchased in 1996 and 1997, at or about the same time each payment was made to him by Mrs. Haynes, from K & B Drugstores in the New Orleans area. The ODC subsequently discovered that all of these money orders had been purchased in 1998, not 1996 or 1997, and in fact, several were purchased on the day before the formal hearing was held in Harris I. Furthermore, the serial numbers on the six original money orders ultimately received by Mrs. Haynes did not match the serial numbers on the photocopies of the seven money orders produced by respondent at the hearing. Indeed, several of the money orders received by Mrs. Haynes were not purchased until after the July 22, 1998 hearing had been held.
*1187 The ODC notified respondent of its findings, and thereafter the hearing committee reconvened on October 2, 1998. That morning, respondent filed a pre-hearing memorandum with attachments into the record of the Harris I proceeding. The attachments included a photocopy of an undated, handwritten document purporting to be a confession of Mary Harris Stirgus, respondent’s sister, and a photocopy of a typewritten affidavit that was purportedly executed by Mrs. Stirgus on August 24, 1998. The affidavit was notarized by respondent and witnessed by | ./‘Douglas C. Jones” and “Triva Garret.”[2] Together, these documents purported to represent an admission by Mrs. Stirgus that' she converted to her own use the original Haynes money orders respondent purchased in 1996 and 1997 and that she later purchased replacement money orders. The ODC objected to the introduction of the documents on hearsay grounds, and noted that respondent did not have in his possession the original of either the handwritten confession or the affidavit. It was at this point that respondent disclosed that Mrs. Stirgus had died on August 27, 1998, just three days after she allegedly executed the affidavit. The hearing committee sustained the ODC’s objection to the introduction of the documents attached to respondent’s pre-hearing memorandum but nevertheless agreed to consider the memorandum itself. In the memorandum, respondent explained in great detail the. alleged confession made to him by Mrs. Stirgus, and he specifically stated that Mrs. Stirgus worked as a secretary in his law office; that she was the one responsible for having stolen the money orders out of the Haynes file; and that she was present in his office on various occasions between the initial hearing on July 22, 1998 through the middle of August 1998.
Harris I made its way from the hearing committee to the disciplinary board, then ultimately to this court. All of the facts regarding respondent’s representation of Mr. Haynes in the criminal case, as well as the facts pertaining to respondent’s conduct after the filing of formal charges, were brought to our attention in that matter. After consideration, we determined that respondent’s post-formal charge conduct should be treated as separate and distinct misconduct in a subsequent disciplinary proceeding:
Under the circumstances of this case, and in consideration of the interests of justice and due process, we believe this |4misconduct should be alleged by separate formal charges. We recognize that the ODC could not have anticipated respondent’s actions at. the time it filed the formal charges. After the ODC concluded respondent made misrepresentations during the original hearing before the committee, it made an effort to inform respondent by letter that it would present these allegations when the hearing was reopened. Nonetheless, we find the ODC’s letter is not an adequate substitute for the filing of formal charges pursuant to Supreme Court Rule XIX, § 11(E). Without formal charges, there was nothing to inform respondent what professional rules were violated, or what specific allegations the ODC intended to prove. The procedural confusion is evident from the fact that the hearing committee made no specific findings with regard to these allegations. Moreover, the filing of formal charges alleging fairly serious misconduct at the original hearing may have caused re *1188 spondent to re-evaluate his decision to represent himself at the subsequent hearing, and prompted him to hire separate counsel. Under these facts, we conclude the most prudent course of action is to defer consideration of this conduct and remand the matter to the Office of Disciplinary Counsel to consider filing new formal charges.
Harris I, 00-1825 at pp. 12-13, 774 So.2d at 969 (emphasis added; internal footnote omitted). ■
Following remand, the ODC conducted further investigation of respondent’s conduct. This investigation revealed that the signature on the handwritten confession purporting to be that of Mary Harris Stir-gus is a forgery, as is the signature of Mrs. Stirgus on the affidavit notarized by respondent. Moreover, the ODC learned that on August 23, 1998, the day before Mrs. Stirgus allegedly executed the affidavit, she was admitted to University Hospital’s intensive care unit, where she was found to suffer from chronic renal insufficiency secondary to diabetic neuropathy and was diagnosed with probable mild delirium. Mrs. Stirgus died in the ICU on August 27,1998.[3]
^DISCIPLINARY PROCEEDINGS
Upon concluding these additional investigative efforts, the ODC filed one count of formal charges against respondent on August 6, 2001 (this proceeding is referred to herein as Harris II). The charges allege that respondent made false statements of material fact or law to a tribunal in violation of Rule 3.3(a)(1) of the Louisiana Rules of Professional Conduct; offered evidence that he knew to be false in violation of Rule 3.3(a)(4); falsified evidence in violation of Rule 3.4(b); knowingly made false statements of material fact in connection with a disciplinary matter, in violation of Rule 8.1(a); violated the Rules of Professional Conduct in violation of Rule 8.4(a); engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c); engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d); and, in bad faith, obstructed the disciplinary process in violation of Rules 8.1(c) and 8.4(g) and Supreme Court Rule XIX, § 12(A).
Respondent subsequently answered the formal charges and denied any misconduct. Respondent reiterated that it was his sister, the late Mrs. Stirgus, who had tampered with the money orders in the Haynes file, and he stated that she was not incompetent to execute the August 24, 1998 affidavit in which she allegedly confessed to doing so.

Review of the Record

Harris II proceeded to a formal hearing on the merits on January 7, 2002. At the hearing, the ODC introduced a volume of documentary evidence in support of the formal charges, including (1) the November 13, 2000 opinion of this court in Harris | el; (2) the transcripts of the July 22, 1998 and October 2, 1998 hearings in Harris I; (3) various exhibits introduced into evi *1189 dence in Harris I, including documents relating to the money orders purchased by respondent; (4) the pre-hearing memorandum that respondent filed before the reconvened hearing in Harris I, and the handwritten confession and affidavit purportedly executed by Mrs. Stirgus; (5) Mrs. Stirgus’ medical records and death certificate; (6) copies of respondent’s correspondence to Mr. Haynes and his mother threatening civil action if they went forward with the disciplinary proceedings; and (7) samples of Mrs. Stirgus’ signature.[4] In addition, both respondent and the ODC called several witnesses to testify in person before the committee.
The first witness to testify was 'Robert Foley, a forensic document examiner and a Louisiana-licensed attorney. Mr. Foley testified that he was retained by the ODC to determine the authenticity of the signatures on the handwritten confession and on the affidavit purporting to be those of Mrs. Stirgus. First, Mr. Foley examined various samples of Mrs. Stirgus’ signature and compared them with the signature appearing on the handwritten confession. .Mr. Foley opined that based on his examination, it was more probable than not that the signature on the confession .is not the genuine signature of Mrs. Stirgus. Furthermore, Mr. Foley noted that the signatures appearing on the handwritten confession and on the August 24, 1998 affidavit are absolutely identical. Suggesting that the natural “probability of that occurring is nil to none,” Mr. Foley testified that the signature on the affidavit was likely “lifted” from the confession, which is “a typical or classical example of a fabrication.”
[7The ODC next called Samuel Stirgus and Michael Stirgus, the widower and son, respectively, of respondent’s sister. Although the relationship between Samuel Stirgus and respondent is very strained, Samuel Stirgus testified emphatically that the signatures on the confession and the affidavit purporting to be those of his late wife were not. genuine. Samuel Stirgus also testified that Mrs. Stirgus never worked in respondent’s office, with the exception of a single day in 1996 when she answered telephones for less than an hour, and that her health was very poor in the year prior to her death. Samuel Stirgus explained that he took care of his wife’s needs on a daily basis, particularly after her leg was amputated, and that he took her to all of her medical appointments because she did not drive at all. Michael Stirgus confirmed that his mother was essentially bedridden after her leg was amputated, and that she was nearly blind from diabetes and unable to attend to her own needs. Michael Stirgus testified that he did not recall seeing respondent at the hospital when his mother was in intensive care, nor had he ever seen the two persons who allegedly witnessed his mother’s signature on the affidavit. According to Michael Stirgus, it would have been “impossible” for his mother to have executed the affidavit on August 24, 1998, given her medical condition at the time. He further testified that the signatures on the confession and the affidavit purporting to be his mother’s were not authentic, and he stated that in fact, the handwriting looked “a lot like” respondent’s.
Respondent did not testify at the hearing. He called three witnesses to testify in person, namely Wilburine Pollard, Trivia Garrett, and Margaret Richard. Ms. Pollard testified that she spoke with Mrs. Stirgus by telephone from respondent’s *1190 law ofñce one day in early August 1998. Ms. Richard testified that she visited respondent’s office in August 1998, and the receptionist there was an amputee in a wheelchair.
IsTrivia Garrett was called to testify as one of the two witnesses to Mrs. Stirgus’ “signature” on the August 24, 1998 affidavit. Ms. Garrett testified that she met respondent through her former boyfriend, Douglas C. Jones. On August 24, 1998, Mr. Jones and Ms. Garrett went to respondent’s office. When they arrived, respondent was typing an affidavit, and he asked whether Mr. Jones and Ms. Garrett would accompany him to the intensive • care unit of University Hospital to witness his sister’s signature on that document. Both agreed to do so, and Ms. Garrett testified that they went into the ICU “for like a second,” standing in the doorway of Mrs. Stirgus’ room just long enough to see her sign the affidavit and to sign their own names. On cross-examination, Ms. Garrett denied having a driver’s license or any form of picture identification with her. She also denied having any document in her possession bearing her signature, and she adamantly refused to provide a sample of her signature to the hearing committee, allegedly on the advice of a Texas attorney whom she refused to name. When asked why she would have misspelled her own name on the affidavit (“Triva Garret,” rather than Trivia Garrett), Ms. Garrett explained that she signed her name the same way it had been typed because she did not want respondent to have to type the document again.
At the conclusion of the hearing, respondent requested that the record be held open to receive the deposition testimony of two additional witnesses, Reverend Elton Reed and Douglas C. Jones, the second witness to Mrs. Stirgus’ “signature” on the August 24, 1998 affidavit. The hearing committee chairman agreed to do so if the depositions were filed into the record by February 22, 2002. However, neither deposition was ever taken.
On January 15, 2002, a week after the initial hearing in Hams II, respondent filed a motion to reconvene the hearing committee so that he could recall Robert Foley, the forensic document examiner, and pose.additional questions to him. The IflODC did not object to respondent’s request, indicating that it, too, had further handwriting evidence it wished to present. Accordingly, the matter was set for a second hearing before the hearing committee on March 27, 2002.
At the second hearing, the ODC informed the committee that it had issued a subpoena to the Department of Motor Vehicles and to the Orleans Parish Registrar of Voters to obtain samples of the signature of Ms. Trivia Garrett. The ODC then provided all of the samples to Mr. Foley for examination. In his testimony before the hearing committee, Mr. Foley stated it was probable that the person who signed Ms. Garrett’s name to the driver’s license and to the voter registration application was not the same person who signed “Triva Garret” on the affidavit allegedly executed by Mrs. Stirgus.[5]
*1191 Mr. Foley also examined various exemplars of respondent’s handwriting in an effort to determine whether he signed his sister’s name to the affidavit or wrote her alleged confession in his own hand. After examination of these exemplars, Mr. Foley testified it was probable that respondent did not sign Mrs. Stirgus’ name to the affidavit. Mir. Foley further opined that the same person who wrote the handwritten confession signed Mrs. Stirgus’ name to it, but that person was probably not respondent, Mrs. Stirgus, or Ms. Garrett.

Hearing Committee Recommendation

In its May 20, 2002 report, the hearing committee made the following factual findings:
|inl. Respondent represented Robert Haynes in connection with a criminal matter and out of that representation grew an earlier disciplinary proceeding bearing Disciplinary Docket No. 97-DB-078, and Supreme Court Docket No. 2000-B-1825. Respondent’s handling of funds paid to him by Patricia Haynes on behalf of her son Robert Haynes was an issue. Shortly before a July 22, 1998 hearing, respondent threatened Robert and Patricia Haynes with civil litigation if either of them testified against him in his disciplinary proceedings. Additionally, respondent defended the trust-account allegations by explaining that each time he received a payment from Patricia Haynes, he went out and purchased a money order for that same amount and placed the original money order in his file.
2.The money orders submitted as evidence by respondent in the first proceeding did not correlate with those provided to Patricia Haynes — some of which were even dated after that July 22,1998 hearing.
3. In response to ODC’s questioning of the money orders submitted by respondent to refute the commingling allegations, on October 2, 1998, respondent submitted to the prior, reconvened panel copies (not originals) of the purported Mary Harris Stirgus “confession” statement and affidavit — apparently to explain the money-order date discrepancies.
4. In an opinion dated November 13, 2000, the Louisiana Supreme Court found that respondent’s representation of Robert Haynes violated the Rules of Professional Conduct and he was suspended from the practice of law for a period of 18 months. The Supreme Court declined to consider ODC’s allegations that he had threatened civil litigation against Patricia and Robert Haynes if they testified against him in the disciplinary proceeding; the false aspects of the money orders introduced by respondent in the July 22, 1998 11¶ disciplinary hearing; and the allegation that respondent provided perjured testimony during both his July 22, 1998 hearing and his October 2, 1998 hearing. The Supreme Court remanded those aspects of the case back to the ODC for further investigation and the filing of formal charges.
5. The evidence in the original and underlying disciplinary proceeding established that respondent intentionally threatened civil litigation in retaliation against Patricia Haynes and Robert Haynes if either of them testified against him in his disciplinary proceeding.
6. Mary Harris Stirgus’ medical records reflect that in May of 1998 she stumbled and snapped her right ankle requiring several surgeries. *1192 On June 22, 1998, Mary Harris Stirgus had the first of two below-the-knee amputations. She was not discharged from the hospital until June 29, 1998. She was readmitted on July 13, 1998 and stayed until July 17, 1998. The hospital discharge records reflect that she would not and could not walk, even on crutches. On July 22, 1998, Mary Harris Stirgus returned to her orthopedic clinic for follow up care as she did on July 29th, August 5th, and August 12th. Mary Harris Stirgus was admitted to [University Hospital] August 23, 1998 to the ICU, where she remained until her death on August 27,1998.
7. The dates of Mary Harris Stirgus’ hospitalizations and her medical condition, corroborated by the testimony of her husband and son, render it highly unlikely that she worked in respondent’s law office during the summer of 1998. The Committee is disinclined to give much, if any, weight to the Pollard and Richard testimony about vague and unsubstantiated “sightings” of her in the office.
8. The' “confession” statement was written entirely by one person.
|ia9. Respondent, Mary Harris Stir-gus, and Trivia Garrett probably did not write the “confession” statement.
10. Mary Harris Stirgus did not sign the “confession” statement.
11. The “Mary Harris Stirgus” signature on the affidavit was forged from the one on the “confession statement.”
12. The person who signed Trivia Garrett’s voter registration and driver’s license did not affix her name to the affidavit.
13. Respondent notarized the affidavit before it was signed.
14. At a minimum, and fully crediting his witnesses’ testimony, respondent presented an affidavit confessing a crime and exculpating himself to a nearly-blind hospital patient in an intensive care unit and made no effort to read it to her before purportedly seeking her signature.
15. During the pendency of these proceedings, respondent advised Samuel and Michael Stirgus that they need not retain evidence that he knew was relevant and, in fact, material to his disciplinary proceedings.
16. During the pendency of these proceedings, respondent also presented papers about them to Samuel Stirgus for his signature, though Stirgus refused.
17. Respondent presented false evidence about the money orders in the Haynes proceeding.
18. Respondent presented false testimony about the money orders in the course of the Haynes proceeding.
19. Respondent’s notarization of the affidavit was a false statement.
20. Respondent submitted the “confession” statement under circumstances clearly indicating he knew or should have known it was false.
21. Respondent submitted the affidavit under circumstances clearly indicating he knew or should have known it was false.
11322. Respondent submitted the affidavit under circumstances clearly indicating he knew or should have known the Triva Garret signature on it was false.
23. Respondent submitted the testimony of Trivia Garrett at the January *1193 7, 2000 hearing under circumstances clearly indicating he knew or should have known that testimony was false.[6]
Based on these factual findings, the committee found the ODC proved by clear and convincing evidence that respondent made false statements of material fact to a tribunal in violation of Rule 3.3(a)(1) of the Louisiana Rules of Professional Conduct; offered evidence that he knew to be false in violation of Rule 3.3(a)(4); falsified evidence in violation of Rule 3.4(b); knowingly made false statements of material fact in connection with a disciplinary matter, in violation of Rule 8.1(a); violated the Rules of Professional Conduct in violation of Rule 8.4(a); engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c); engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d); in bad faith, obstructed the disciplinary process in violation of Rules 8.1(c) and 8.4(g); and threatened civil litigation as retaliation against Patricia Haynes and her son, Robert Haynes, should either of them testify against him in the disciplinary proceedings, in violation of Supreme Court Rule XIX, § 12(A). The committee concluded the baseline sanction for this misconduct is disbarment.
The committee determined that respondent violated duties owed to the public, the legal system, and the profession. The committee noted numerous aggravating factors are present, namely respondent’s prior disciplinary offense in Harris I, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary proceeding, submission of false evidence, false | l4statements, and other deceptive practices during the disciplinary process, his refusal to acknowledge the wrongful nature of his conduct, vulnerability of the victim (Mrs. Stirgus), and substantial experience in the practice of law (admitted 1987). The committee found no mitigating factors exist.
Considering these circumstances, and finding respondent’s conduct meets two of the permanent disbarment guidelines,[7] the committee recommended that he be permanently disbarred.
The ODC concurred in the hearing committee’s recommendation. Respondent objected to the committee’s factual findings, legal conclusions, and recommendation of permanent disbarment.

Disciplinary Board Recommendation

After reviewing this matter, the disciplinary board found that the hearing committee’s factual findings are generally supported by the record. With respect to the committee’s application of the Louisiana Rules of Professional Conduct, the board determined the committee correctly applied Rules 3.3(a)(1), 3.3(a)(4), 3.4(b), 8.1(a), 8.1(c), 8.4(a), 8.4(c), 8.4(d), and 8.4(g). However, with respect to the committee’s finding that respondent violated Supreme Court Rule XIX, § 12(A) by threatening civil litigation as retaliation against Patricia Haynes and Robert Haynes, the board noted that rule does not provide a disciplinary remedy. According *1194 ly, the board declined to find that respondent violated Rule XIX, § 12(A).
|1F;Given the rule violations present, respondent’s mental state, and the injury caused by the misconduct, the board concluded the applicable baseline sanction is disbarment. The board concurred in the numerous aggravating factors found by the committee, and agreed that no mitigating factors are present. The board also agreed that respondent’s conduct falls under the permanent disbarment guidelines. Accordingly, the board recommended that respondent be permanently disbarred. The board also recommended that respondent be assessed with all costs and expenses of these proceedings, with legal interest to commence running thirty days from the date of finality of the court’s judgment until paid.
Neither respondent nor the ODC filed an objection to the disciplinary board’s recommendation.
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. .V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
The record supports a finding of professional misconduct that is unquestionably serious in nature. Respondent manu-factored evidence and presented perjured testimony in an attempt to avoid lawyer discipline, and he threatened his former clients with civil litigation if either of them testified against him in the disciplinary | t (¡proceeding. By engaging in these practices, respondent has violated the most fundamental duty of an officer of the court.
Having found evidence of professional misconduct, the sole issue presented for our consideration is the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in fight of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent’s conduct clearly violated duties owed to the public, the legal system, and the profession. In our view, respondent’s breach of ethics was profound and directly affected the lawyer disciplinary system and the administration of justice. In particular, the knowing submission of fabricated evidence and false testimony relating to respondent’s late sister calls into question his suitability to discharge his professional duties. There are no mitigating factors; however, numerous aggravating factors are present. Under these circumstances, we conclude disbarment is unquestionably the proper sanction.
The disciplinary board has recommended to us that respondent’s conduct is so egregious as to warrant the imposition *1195 of permanent disbarment, as set forth in the 117amendments to Supreme Court Rule XIX, § 10[8] and § 24.[9] We agree that respondent’s conduct fits several of the permanent disbarment guidelines set forth in Appendix E to the Rides of Lawyer Disciplinary Enforcement, including Guideline 2 (“intentional corruption of the judicial process, including but not limited to bribery, perjury, and subornation of perjury”) and Guideline 9 (“instances of serious attorney misconduct ... preceded by suspension or disbarment for prior instances of serious attorney misconduct
We do not lightly impose the sanction of permanent disbarment. In re: Morphis, 01-2803 (La.12/4/02), 881 So.2d 934. Nonetheless, we are firmly convinced that we would be remiss in our constitutional duty to regulate the practice of law if we did not impose that sanction here. Respondent engaged in conduct that was actively intended to frustrate the administration of justice. This court cannot and will not tolerate such conduct by an attorney. Respondent’s actions convincingly demonstrate he does not possess the requisite moral fitness to practice law in this state. He must be permanently disbarred.
| ^Accordingly, we will accept the disciplinary board’s recommendation and impose permanent disbarment.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, it is ordered that the name of Ray Charles Harris, Louisiana Bar Roll number 17963, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. Respondent received funds from Mrs. Haynes on February 6, 1996 ($500); June 6, 1996 ($250); November 8, 1996 ($100); February 4, 1997 ($100); February 6, 1997($50); and February 8, 1997 ($100).

. The name "Triva Garret” is typed beneath the witness' signature. In fact, as is discussed in greater detail elsewhere in this opinion, the correct spelling of the witness' name is Trivia Garrett.

. In fact, Mrs. Stirgus’ medical records reflect that in May 1998, she stumbled and snapped her right ankle, requiring surgery. After additional difficulties required further surgical intervention, Mrs. Stirgus underwent the first of two below-the-knee amputation procedures on June 22, 1998. She was discharged from the hospital on June 29, 1998, but was readmitted on July 13, 1998 for severe right leg pain and for the opening of her amputation sight wound. She was discharged from the hospital on July 17, 1998 with the instruction that she not ambulate, not even on crutches. She returned to the orthopaedic clinic for follow-up care on July 22, July 29, August 5, and August 12, 1998. The ODC suggests that throughout this period of time, it is highly unlikely Mrs. Stirgus could have worked in respondent's law office, as he claimed she did in July and August 1998.

. These samples were taken from Mrs. Stir-gus' medical consent forms, from her Louisiana identification card, and from a page in her address book. Interestingly, Mrs. Stirgus' husband, Samuel Stirgus, testified during the hearing that respondent told him to throw these samples away and not to share the information with the ODC.

. The ODC also obtained samples of the signature of Douglas C. Jones, who was then incarcerated at Hunt Correctional Center, from the Department of Corrections. These samples were provided to Mr. Foley for examination. However, during the second hearing, the committee refused to admit the handwriting samples into evidence, and refused to allow Mr. Foley to testify oh the issue of the authenticity of Mr. Jones’ signature on the affidavit allegedly executed by Mrs. Stirgus. Accordingly, the exhibits and Mr. Foley’s testimony were proffered by the ODC. In the proffer, Mr. Foley testified it was probable that the person who signed Mr. Jones’ name on the sample documents provided was not the same person who signed "Douglas C. Jones” on the affidavit.

. The committee specifically found that Ms. Garrett's testimony was “untrustworthy and generally lacking credibility.”

. See Supreme Court Rule XIX, Appendix E, Guidelines Depicting Conduct Which Might Warrant Permanent Disbarment:
Guideline 2: Intentional corruption of the judicial process, including but not limited to bribeiy, perjury, and subornation of perjury-
Guideline 9: Instances of serious attorney misconduct ... preceded by suspension or disbarment for prior instances of serious attorney misconduct.... Serious attorney misconduct is defined for purposes of these guidelines as any misconduct which results in a suspension of more than one year.

. Supreme Court Rule XIX, § 10(A) was amended to add the highlighted language:
(1) Disbarment by the court. In any order or judgment of the court in which a lawyer is disbarred, the court retains the discretion to permanently disbar the lawyer and permanently prohibit any such lawyer from being readmitted to the practice of law.

. Supreme Court Rule XIX, § 24(A) was amended to add the highlighted language:
A disbarred lawyer or a suspended lawyer who has served a suspension period of more than one year, exclusive of any waivers or periods of deferral, shall be reinstated or readmitted only upon order of the court. No lawyer may petition for reinstatement until six months before the period of suspension has expired. No lawyer may petition for readmission until five years after the effective date of disbarment. A lawyer who has been placed on interim suspension and is then disbarred for the same misconduct that was the ground for the interim suspension may petition for readmission at the expiration of five years from the time of the effective date of the interim suspension. The court retains the discretion, in accordance with Section 10A of this rule, to permanently disbar a lawyer and permanently prohibit any such lawyer from being readmitted to the practice of law.