# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #005

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **30th day of January, 2019**, are as follows:

**PER CURIAM**:

2018-B-0383          IN RE: WILLIAM MAGEE

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that William Magee, Louisiana Bar Roll number 8859, be and he hereby is suspended from the practice of law for a period of two years. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

WEIMER, J., concurs in part and dissents in part and assigns reasons.
HUGHES, J., dissents with reasons.

SUPREME COURT OF LOUISIANA

NO. 2018-B-0383

IN RE: WILLIAM MAGEE

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, William Magee, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS**

The ODC alleges that in three separate transactions between 1999 and 2001, respondent used false and deceptive practices to obtain the ownership of immovable property in St. Tammany Parish belonging to absentee owners.[1] To that end, respondent created three fictitious quitclaim deeds purporting to transfer the properties from his closely held corporation, Hickory Glade, Inc., to himself. Respondent then signed the name of Timothy Dunaway, his Hickory Glade co-owner, to the deeds as seller without Mr. Dunaway's knowledge or consent. Respondent affixed his own signature to the documents as buyer. No money changed hands in the transfers, and respondent acknowledges that Hickory Glade possessed absolutely no ownership interest in the St. Tammany Parish properties that the deeds purported to convey. Rather, the ODC alleges that by structuring the

---

[1] The first property, the Nill property, was subdivided into two lots that were eventually owned by complainants Carol Robinson and Lloyd and Nicole Martin. The second property, the Wantz property, was eventually owned by complainants Andrea and John Lampo. The third property, the Hymel and Turnbull property, consists of several lots.

transactions in this way, respondent sought to create the illusion of a routine arms-length transaction signifying the bona fide transfers of the properties.

After having the signatures on the deeds notarized, respondent inserted these false transactions into the chain of title of all three properties by filing them into the public records of St. Tammany Parish. Respondent then filed suits for declaratory judgment in the 22nd Judicial District Court for the Parish of St. Tammany seeking to have him declared as owner of the properties. In all material respects, the petitions for declaratory judgment were the same, as follows:

I.

Petitioner possesses as owner a particular parcel of land (description of land). Petitioner acquired his interest in the subject property by act dated (date) and recorded as Instrument (number).

II.

Petitioner has been in possession of the subject property as owner in excess of one (1) year, which possession has been uninterrupted and continuous.

III.

Petitioner has cut trees on the property, fenced the property, placed "For Sale By Owner" signs on said property, and otherwise possessed as owner the subject property during his period of possession.

IV.

An examination of the public records reveals a disturbance in law affecting the subject property. It appears as though the following person(s) purportedly owned interests in the subject property, having acquired said interests by acquisitions recorded in the official records of the Parish of St. Tammany, as follows:
(Previous owner(s), COB, date)

V.

The above named individuals are the last known owners or purport to have an ownership interest in and to the subject property, having acquired said interest by the acts dated and recorded as indicated above.

VI.

The said defendants are absentees and/or non-residents as those terms are defined in the Louisiana Code of Civil Procedure and it is therefore necessary that an attorney be

2

appointed to stand in judgment for and receive service of citation for said defendants.

## VII.

Petitioner alleges and shows that by his open, actual and notorious corporeal possession of the property made the subject of this litigation, that he is entitled to a judgment of this court maintaining him in possession of the subject property and ultimately declaring him to be the owner of said property.

WHEREFORE, Petitioner prays that an attorney at law be appointed to represent the absent defendants, (name), their spouses, heirs, successors and assigns, if they be known, and to receive service and citation for them, attempt to locate them, and to stand in judgment for said absent defendants.

Petitioner further prays, that after due proceedings had, there be judgment in his favor and against the absent defendants, recognizing the plaintiff's right to the possession of the immovable property described above, and maintaining him in possession thereof, and in the event that the defendants do not assert an adverse claim of ownership of the said immovable property in their answer herein that there be judgment herein ordering the defendants to assert any adverse claim of ownership of the said immovable property in a petitory action to be filed within a delay to be set by the court not to exceed thirty days after the date the judgment becomes executory, or be precluded thereafter from asserting any ownership thereof and declaring petitioner to be the owner of said property.

Respondent testified on his own behalf at the default hearings. His testimony tracked the representations made in the petitions for declaratory judgment. He did not advise the court of the fact that he had drafted the quitclaim deeds himself, having assumed the role of both seller and purchaser. The ODC alleges that in failing to inform the court of this crucial fact, respondent sought to give the judges the false impression that the "acts" which he referenced in his petition were bona fide transfers of ownership.

Once he obtained default judgments declaring him to be the owners of the tracts, respondent sold the properties to a third party, who in turn transferred lots to the complainants as home sites. At the time these individuals purchased their lots,

they were unaware of respondent's title practices. They thereafter began to experience difficulties in trying to sell their properties or refinance their mortgages. Title insurers refused to issue title policies on the properties involved, citing respondent's quitclaim deeds as a "cloud" on the title, which resulted in failed home sales and refinancings.

One of the purchasers, complainants Lloyd and Nicole Martin, filed suit in state court against their title insurer, Fidelity National Title Insurance Company, seeking to hold the insurer responsible for curing title defects and paying damages for harm and inconvenience caused by the defective title. The suit was later removed to the United States District Court for the Eastern District of Louisiana. In turn, the title company sued respondent as a third-party defendant, alleging that he had caused the defects by virtue of the suspect methods which he used to obtain prior title.

Respondent answered the suit and filed a motion for summary judgment which the federal court denied in 2011. The following year, in 2012, the federal court granted judgment on the third party demand against respondent and in favor of the title company, finding respondent liable for improperly creating a cloud on the title by manufacturing a chain of title to the property using questionable quitclaim deeds. Respondent did not appeal the federal court's judgment and was ordered to pay the cost of the record owners' interest in the properties.

**DISCIPLINARY PROCEEDINGS**

In October 2012, the ODC received three complaints against respondent from persons who had purchased lots in St. Tammany Parish in which respondent and Hickory Glade had inserted themselves in the chain of title using the procedure set forth above. In April 2015, the ODC filed formal charges against respondent, alleging that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 3.3(a) (candor toward the tribunal), 3.3(d) (in an *ex*

4

*parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse, and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.

Respondent answered the formal charges and denied any misconduct. According to respondent, after undertaking extensive legal research, he had determined that title to abandoned properties could be legally transferred via a declaratory judgment action, even if the transferor had no valid title to the property. In utilizing this procedure, respondent would identify an abandoned piece of property and would attempt to locate the last owners of record to explore purchasing the property. If the owners could not be located, respondent would insert himself into the chain of title by having someone execute a quitclaim in his favor. The quitclaim would then be recorded in the public records. Respondent has never contended or represented that the quitclaiming party had any actual ownership interest in the property. Rather, respondent created the quitclaim solely as a document in the public records that established civil possession of the property.[2] Both before and after recording the quitclaim, respondent would exercise open and obvious physical possession over the property by doing things such as having a survey of the property made, placing "For Sale by Owner" signs on the property, fencing the property, and mowing the grass and otherwise cleaning up the property.

After a minimum of one year of possession, respondent would cause a declaratory judgment action to be commenced pursuant to La. Code Civ. P. art.

---

[2] In his sworn statement, respondent also explained that he used the quitclaim deeds "merely to establish a date on which civil possession began." However, in his testimony at the formal hearing, respondent testified that the quitclaim deeds also had "the added effect of allowing the property to be put back on the tax rolls and you do another act of civil possession which is pay the taxes." Moreover, respondent claimed that some of the properties he acquired were "landlocked" and not publicly accessible, and therefore his acts of corporeal possession were not visible to the public, so the quitclaim deed was an extra step above and beyond what was required by law.

3654.[3] If the last titled owners of the property still could not be located and served, respondent would request that a curator be appointed to represent their interests. If still no one came forward, respondent would proceed with default judgment, at which time the court would declare him to be the rightful owner of the property.

In 1996, when respondent was the Town Attorney for the Town of Abita Springs, he was instructed by the town to undertake a legal process whereby various vacant and abandoned properties within the city limits could be deeded to the town as green spaces and/or brought back into commerce. Respondent initially determined that ownership to these properties could be transferred to the town via the use of the declaratory/possessory actions procedure, but subsequently further research caused him to conclude that this procedure could not be used by a public entity. Respondent, however, continued to use the procedure for his or his private clients' use and development. In 1996, some members of the Board of Aldermen objected to this. The town had respondent's procedural methods of obtaining ownership over vacant property independently reviewed by two other attorneys, who according to respondent concluded that his actions were legal and authorized by Louisiana law. Nevertheless, because of the controversy and the potential for a conflict of interest, respondent resigned his position as the Town Attorney for the Town of Abita Springs.

---

[3] La. Code Civ. P. art. 3654, entitled "Proof of title in action for declaratory judgment, concursus, expropriation, or similar proceeding," provides in pertinent part as follows:

> When the issue of ownership of immovable property or of a real right therein is presented in an action for a declaratory judgment, … the court shall render judgment in favor of the party:
>
> (1) Who would be entitled to the possession of the immovable property or real right therein in a possessory action, unless the adverse party proves that he has acquired ownership from a previous owner or by acquisitive prescription; …

Respondent maintained that he has continued to use this procedure on a number of occasions, both on his own behalf and on behalf of clients.[4]  He suggested that his actions were at all times open and obvious and were fully documented in the public and court records.  No Louisiana court has held that respondent's practices of obtaining property through the declaratory/possessory actions procedure is illegal or unsupported under Louisiana law.  Nevertheless, respondent stated that he ceased using this procedure in 2009 when certain title insurers began to refuse to issue title insurance on transactions involving the procedure.

Regarding Hickory Glade, respondent stated that he incorporated the entity in 1991 to purchase and hold one piece of immovable property.  At all times pertinent, respondent served as vice president of Hickory Glade.  Respondent and his wife, and Timothy Dunaway and his wife, were the original incorporators of Hickory Glade.  However, according to respondent, his wife and Mr. and Mrs. Dunaway played no role in the operation of Hickory Glade.  Mr. Dunaway, the president of Hickory Glade, did not work for the corporation and only participated in charging revenues generated by Hickory Glade in the purchase and sale of one piece of campground property.  Virtually all operations of Hickory Glade were conducted by respondent and it was the routine practice for him to act on behalf of Hickory Glade.

Respondent does not deny that he signed Mr. Dunaway's name to the quitclaim deeds referenced in the formal charges.  However, this was an act on behalf of Hickory Glade and not Mr. Dunaway personally.  It did not injure any party, including Mr. Dunaway, and respondent's use of Mr. Dunaway's signature was subsequently ratified by authentic act of Hickory Glade.  There has never been a finding of forgery.  Moreover, respondent's signing of Mr. Dunaway's name to the

---

[4] Based on research, respondent believes that he has used this procedure fourteen times to acquire immovable property.  Nine of the transactions were done on behalf of clients, and five times the transactions were done for respondent's personal benefit.  In the three cases cited in the formal charges, respondent filed a quitclaim deed into the public record.

7

quitclaim deeds was done under his longstanding belief that he had the apparent authority to act on behalf of Hickory Glade based on the consistent operations of Hickory Glade in the past.

Respondent concluded:

> Mr. Magee respectfully disagrees that there was something unethical in the above referenced procedure used by him in obtaining property. The procedure used by Mr. Magee and others, while admittedly unusual and "out of the box" as described by Mr. Magee, is not illegal. The procedure, however, was openly used and discussed for many years including while Mr. Magee was employed by the town of Abita Springs. Mr. Magee's procedure has been held valid by a number of judges in the 22nd Judicial District Court. In addition, two other independent lawyers retained by the town of Abita Springs and unrelated to Mr. Magee opined that his procedure was authorized under or supported by Louisiana law. Furthermore, the properties at issue were always vacant, abandoned and off the tax rolls. Mr. Magee's actions actually placed these properties back into the stream of commerce benefitting Mr. Magee, the subsequent owners, and the various taxing authorities in St. Tammany Parish.

*Formal Hearing*

Following the filing of respondent's answer, the matter was set for a hearing. The ODC called the following witnesses to testify before the hearing committee: Shreveport attorney David Cromwell, who was accepted as an expert in real estate law and practice; Judge William Burris of the 22nd JDC; New Orleans attorney Scott Gallinghouse, underwriting counsel for First American Title Insurance Company; Covington attorney Charlene Kazan, an employee of respondent's law firm; Judge Mary Devereux of the 22nd JDC, who was formerly respondent's law partner; and complainants Andre Lampo, Carol Robinson, and Lloyd and Nicole Morton.

Respondent testified on his own behalf and on cross examination by the ODC. He also called the following witnesses to testify before the hearing committee: Covington attorney Michael Stone, who was accepted as an expert in real estate

closings; Covington attorney Patricia Fox; Steve Scoggin, a real estate appraiser and broker; and Phillip Lynch, a character witness.

*Hearing Committee Report*

To recap the procedure used by respondent, he took corporeal possession of the properties in question by building fences, maintaining the grounds, posting "For Sale by Owner" signs, and other acts of physical possession. He followed physical possession with civil possession by filing quitclaim deeds into the public records. According to respondent, the quitclaim deeds simply provided public record of his intent to possess as owner. A quitclaim deed assigns an interest only; if no interest by the assignor exists, then no interest is conveyed.

Respondent maintains that he quietly and without interruption possessed the properties for more than a year. He then brought declaratory actions after completion of one year of corporeal possession. When an adverse party failed to prove ownership or better title, the court granted judgment in favor of respondent.

The hearing committee noted that it was presented with extensive testimony regarding the possessory action, the declaratory action, and the procedure used by respondent employing La. Code Civ. P. art. 3654. The committee commented that whether Louisiana law "actually provides for that procedure is in fact debatable and it is, the committee believes, a matter of legislative intent and we believe there is some ambiguity that was created by drafters of Louisiana law." There is no case law holding that the procedure employed by respondent is any way improper, illicit, false, or deceptive (or that it is not). Nevertheless, while some St. Tammany Parish real estate and title attorneys follow the novel procedure endorsed by respondent, most do not.

Regarding the use of the quitclaim deeds, the committee noted respondent's explanation that he used the quitclaim deeds because his acts of corporeal possession

9

would not be evident to the general public due to the location of the properties. Therefore, respondent created the quitclaim deeds and filed them into the public record as a step beyond what is required by law. He maintained that it was important to alert the public that he possessed the property as owner and that the property would be returned to the tax rolls, which in itself is an act of civil possession.

Some real estate attorneys in St. Tammany Parish believe that these transactions should not be used to transfer ownership of property and that it would indeed create a cloud on the property title. At least one title insurance company, First American, will not write title insurance for such transactions.

Although the committee did not find that the procedure used by respondent was illicit, fraudulent, or illegal, the committee took issue with the fact that he created false quitclaim deeds by not having them properly executed and notarized. Respondent then took the quitclaim deeds and recorded them in the public record in order to complete these transactions.

The three quitclaim deeds exhibiting signatures of respondent's corporate partner, Timothy Dunaway, were actually signed by respondent without Mr. Dunaway's prior knowledge and consent. Mr. Dunaway's signature on each document is accompanied by an attestation clause certifying Mr. Dunaway's signature as being genuine and appropriately witnessed and notarized, none of which was true. Respondent admitted under oath on at least three occasions that he created the false quitclaim deeds on which he affixed someone else's signature and caused them to be notarized by someone else in his office or had them notarized by someone not in the presence of appropriate witnesses.

Whether these quitclaim deeds were more the "belt and suspenders," they were in fact true legal documents. Respondent used the quitclaim deeds to hold out to the public that he had possession and filed them into the public record to obtain a

declaratory judgment under La. Code Civ. P. art. 3654. Accordingly, the committee found respondent violated Rules 3.3 and 8.4(c) of the Rules of Professional Conduct.

The committee concluded:

> It should be noted that this matter is indeed a hyper-technical matter in which there was extensive testimony over a three (3) day period. The committee heard testimony from experts in the field of real estate law, as well as judges, and practicing attorneys. It should be noted that the committee believes respondent, Mr. Magee, took full advantage of each and every opportunity to acquire title to property that may not have been in a traditional matter of practice for the St. Tammany area. It should also be noted that the committee believes that Mr. Magee had full knowledge and understanding that he indeed was acquiring title to property in a manner that was highly suspect and probably not recommended by a majority of the bar that practices in that community. However, the committee also believes that because of the ambiguity in the law and willingness of the Judges of the 22nd Judicial District Court to sign off and approve in hurriedly and quick fashion a declaratory judgment where an absentee property owner was being represented by a curator, not as much scrutiny was given to this obscure transaction.
>
> In an effort to be extremely cautious about whether or not Mr. Magee was in possession of the property he decided to add the extra step of having a quick-claim [sic] deed executed and filed into the public record identifying that he had actual possession before the declaration was signed. However, Mr. Magee admitted that he falsified these quick [sic] claims and the committee thinks that although it may not have been a legal effect there was an ethical duty and obligation for him not to create such documents.

Based on these findings, a majority of the committee recommended that respondent be suspended from the practice of law for six months, fully deferred. The public member dissented.

Both respondent and the ODC filed objections to the hearing committee's report. Respondent argued that a lesser sanction than that recommended by the committee, or no sanction at all, is appropriate in this matter. The ODC took issue

11

with the committee's factual findings and legal conclusions and asserted that a fully deferred six-month suspension is too lenient for respondent's misconduct.

*Disciplinary Board Recommendation*

After review, the disciplinary board agreed with the hearing committee that the declaratory judgment procedure used by respondent in acquiring title to the properties at issue did not violate the Rules of Professional Conduct. The board also agreed that the manner in which respondent handled the quitclaim deeds constituted misconduct. The board made the following findings concerning application of the Rules of Professional Conduct:

Rules 3.3(a)(1) (a lawyer shall not knowingly make a false statement of fact or law to a tribunal) and 3.3(a)(3) (a lawyer shall not knowingly offer evidence that the lawyer knows to be false) – The quitclaim deeds each contained the forged signature of respondent's corporate partner, Timothy Dunaway, and were signed by respondent himself without Mr. Dunaway's prior knowledge and consent. Mr. Dunaway's putative signature was also accompanied by an attestation clause falsely certifying Mr. Dunaway's signature to be genuine and appropriately witnessed and notarized, none of which was true, as respondent has admitted.

By making false statements of fact to the court in his testimony in the *Magee v. Nill* and *Magee v. Wantz* matters concerning the quitclaim deeds,[5] submitting the false quitclaim deed into the record in the *Magee v. Nill* matter, and filing the petitions for declaratory judgment which referenced the false quitclaim deeds into

---

[5] Respondent testified that he possessed the Nill and Wantz properties as owner and acquired his interest by virtue of the quitclaim deeds from Hickory Glade. However, as well established by the ODC, Hickory Glade did not possess an interest in the Nill or Wantz properties which it could have transferred via the quitclaim deeds to respondent. Therefore, there was no interest to acquire via these quitclaim deeds. Respondent's testimony concerning this issue was false and misleading to the court.

12

the records of the *Magee v. Nill*, *Magee v. Wantz*, and *Magee v. Hymel and Turnbull* matters, respondent violated Rules 3.3(a)(1) and 3.3(a)(3).

Respondent argues the quitclaim deeds are irrelevant because such deeds convey only the interest held by the grantor. Here, Hickory Glade had no interest in the property so the quitclaim deed conveyed nothing. Respondent never stated or pleaded that he acquired an ownership interest in the property by virtue of the quitclaim deed but instead merely pleaded and testified that he acquired "his interest." He further argues the quitclaim deed was unnecessary and that his one year of corporeal possession of the property is sufficient to prevail under La. Code Civ. P. art. 3654. He also claims that his signing of the quitclaim deeds was ratified by Hickory Glade.

Respondent is correct that a quitclaim deed conveys only the interest of the grantor, which could be nothing. However, respondent created the appearance of a legitimate interest, filed it into the public record, cited it in his petition, and testified that he acquired an interest in the property through this quitclaim deed, all the while knowing the quitclaim deed conveyed no interest at all. There is no evidence that he ever disclosed that he had no interest other than physical possession to the courts, the curators, or any of his buyers.

Accepting respondent's legal theory, the quitclaim deed was unnecessary. Respondent claims he prepared and filed the quitclaim deed to establish civil possession, which was unnecessary because physical possession alone is sufficient. Therefore, respondent argues, he should not be disciplined for submitting this false and misleading document that he created, filed and relied upon. The board rejected this argument, reasoning that the fact that the wrongful conduct was gratuitous does not make it any less wrongful. Instead, it shows respondent's state of mind and his intent to deceive.

Finally, respondent argues that signing Mr. Dunaway's name to the quitclaim deeds was not wrongful because he had the implied permission of Mr. Dunaway to do so and Hickory Glade later ratified the act. Mr. Dunaway submitted an affidavit attesting that respondent handled the day-to-day business operations of Hickory Glade. He stated that respondent did not ask his permission at the time of signing the quitclaim deeds, although he probably would have granted permission, if asked. The ratification cited by respondent is dated March 1, 2011, and was signed by his wife, Karen Magee, in her capacity as secretary of Hickory Glade. While the board did not find that the ratification was technically illegitimate, the board found it did not excuse respondent's wrongful conduct, citing the approximate ten-year delay in the execution of the ratification, coupled with Mr. Dunaway's confirmation that he did not give respondent permission at the time he signed the quitclaim deeds, and the absence of any documentation that Mr. Dunaway participated in the ratification.

Rule 8.4(c) – For the foregoing reasons, the board concluded that respondent also violated Rule 8.4(c). He engaged in dishonest, fraudulent, and deceitful conduct by confecting false quitclaim deeds, making false statements of fact to the court concerning the deeds, and submitting either a false deed or petitions referencing the deeds into the court record. In finding this rule violation, the board specifically noted that it agreed with the hearing committee's reasoning and did not find that the declaratory judgment procedure used by respondent was itself fraudulent or illegal or in violation of Rule 8.4(c).

Rule 3.3(a)(2) (a lawyer shall not knowingly fail to disclose adverse legal authority to the tribunal) – The board determined that the other methods of acquiring ownership of immovable property under La. Civ. Code arts. 3473-3488 (acquisitive prescription of ten and thirty years) cannot be described as "adverse" to respondent's declaratory judgment procedure under La. Code Civ. P. art. 3654. Instead, La. Code

Civ. P. art. 3654 arguably provides an additional method of acquiring ownership of property. Accordingly, the board did not find a violation of Rule 3.3(a)(2).[6]

Rule 3.3(d) – This rule applies to *ex parte* proceedings. Here, curators were appointed to represent the absent defendants in all three declaratory judgment proceedings. La. Code Civ. P. art. 5091(B) provides that all proceedings against an absentee defendant shall be conducted contradictorily. Since a curator was appointed and appeared, the board did not find that these were *ex parte* proceedings, even though the defendants never received actual notice and the hearings were acknowledged to be in the nature of a confirmation of a default. Consequently, the board found no violation of Rule 3.3(d).

The board determined that respondent violated duties owed to the legal system, the public, and the profession. His actions were intentional.

The board found that the amount of actual injury caused by respondent's misconduct was great. Lloyd and Nicole Martin, the subsequent owners of one of the lots of the Nill property, suffered extensive financial harm and emotional anguish after a scheduled April 2008 closing on their Abita Springs home fell through. Unable to sell their home due to the title defect and facing financial difficulties, they were forced into default of their existing mortgage and were unable to sell their home until 2015. This sale was a short sale, which required them to assume an additional $10,000 in indebtedness which they are currently paying down. The Martins sued their title insurer, who was able to locate the Nill heirs and obtain quitclaim deeds in favor of the Martins. Respondent was ordered to reimburse the title insurer for the cost of obtaining the quitclaim deeds which cleared the cloud on the title.

---

[6] One board member dissented on this point, reasoning that the declaratory judgment procedure used by respondent to obtain ownership of the three properties at issue in the formal charges was fraudulent and not sanctioned by existing law, and therefore violated Rule 3.3(a)(2).

Likewise, Mr. and Mrs. Lampo, subsequent owners of the Wantz property, made efforts to refinance the mortgage on their home, but their efforts were delayed for three years because of the defect in their title. Ms. Carol Robinson, subsequent owner of another section of the Nill property, suffered harm when she, along with the Lampos and the Martins, were sued by respondent for defamation, an act of retaliation for their prior civil RICO suit brought against respondent for damages. Respondent later sought to persuade complaints to dismiss their disciplinary complaints brought against him in return for his dismissal of his defamation action. Ultimately, respondent's attempt to obtain a dismissal of the disciplinary complaints was unsuccessful. Respondent's conduct was publicized in newspaper articles and online in ways that reflected negatively on the profession.

After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined that the applicable baseline sanction is disbarment. Standard 6.11 of the ABA Standards provides that disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding. Here, respondent filed into the public record the three false quitclaims in the matters at issue, later citing them as evidence of legitimate property transfers in order to obtain dispositive title of the properties referenced in the deeds from the St. Tammany Parish courts. As the record reflects, respondent referenced one of the quitclaim deeds in his petition for declaratory judgment in the *Magee v. Nill* matter, and filed a copy of the deed along with his petition. He referenced the other two false quitclaim deeds in his respective petitions for declaratory judgment filed in the *Magee v. Hymel and Turnbull* and *Magee v. Wantz* matters. The record shows that respondent also referred to the false quitclaim deeds in his testimony in the *Magee v. Nill* and *Magee v. Wantz* matters.

16

The board found it troubling that respondent carefully crafted the quitclaims to conceal the self-serving nature of the transactions and perpetuate the false notion that he had acquired an interest in the subject properties. This fact is significant, because Judge Burris, who presided over the *Nill* and *Wantz* matters, had only the record and respondent's testimony upon which to rely, since the proceeding was in the nature of a confirmation. As a result, Judge Burris granted respondent's petitions for declaratory judgment, and respondent acquired the properties at issue. This created a cloud on the title of the properties, which later caused the serious harm suffered by the Lampos, Martins, and Ms. Robinson described above. Respondent also did not disclose to Judge Hedges the true circumstances surrounding the quitclaim deed in the *Magee v. Hymel and Turnbull* matter.[7]

In aggravation, the board found the following factors: willful obstruction of the disciplinary process (respondent's attempt to have complainants dismiss their complaints), multiple offenses, a dishonest or selfish motive, and refusal to acknowledge the wrongful nature of the misconduct (respondent maintains that his motives were benevolent, since they increased tax revenue). In mitigation, the board found the absence of a prior disciplinary record and the imposition of other penalties or sanctions.

Turning to the issue of an appropriate sanction, the board considered the court's prior decisions in *In re: Harris*, 03-0212 (La. 5/9/03), 847 So. 2d 1185; *In re: Pinkston*, 02-3251 (La. 5/20/03), 852 So. 2d 966; and *In re: Simpson*, 07-0070 (La. 6/29/07), 959 So. 2d 836. In *Harris*, the court found that Mr. Harris' knowing

---

[7] Respondent initially claimed that before his appearance in Judge Hedges' court, he "visited her with the Code of Civil Procedure and … said look, I'm going to bring you a confirmation … [and] this is the article I'm going to be using for my support of the claim that I'm making in the petition. And she read it and she says, I don't have any problem with that. …" However, when asked whether he had advised Judge Hedges that the quitclaim deed he had filed into the record was not an arm's length transaction involving a willing buyer and seller, respondent acknowledged, "I was not asked that question, but I would have told her if she would have asked or if the curator would have asked." Nevertheless, Judge Hedges was not called to testify at the hearing, although she had been subpoenaed by the ODC.

submission of fabricated evidence and false testimony at a disciplinary hearing warranted permanent disbarment. Mr. Harris submitted false evidence and testimony regarding when certain money orders were purchased, representing that they had been purchased one to two years before the actual date of purchase. He also submitted a false affidavit that the misconduct had been committed by his sister. Moreover, he had a witness testify that his sister had signed the affidavit, despite evidence that the signature had been forged. Mr. Harris also threatened former clients with civil litigation if they testified against him at the disciplinary hearing.

In *Pinkston*, the respondent was permanently disbarred for intentionally and deliberately misrepresenting facts to a court in an effort to obtain a more lenient prison sentence for his stepson. Mr. Pinkston represented to a judge that the district attorney did not oppose a motion to reduce his stepson's prison sentence from twenty-one years to twelve years, when in fact no such agreement had been made by the district attorney's office. The sentence was reduced based on this false representation, and Mr. Pinkston's stepson was temporarily released from prison. This court concluded that Mr. Pinkston's actions were an intentional corruption of the judicial process.

Finally, in *Simpson*, the respondent charged an excessive legal fee to his clients in a succession matter and improperly filed a harassing lawsuit against this former client, presumably in response to her filing a disciplinary complaint against him. Mr. Simpson received a three-year suspension, with all but one year and one day deferred, subject to various conditions.

Considering these factors, the board concluded:

> Here, Respondent filed false documents into the public records of St. Tammany Parish. He also submitted false documents and testimony to the courts when he filed or referenced the quitclaims at issue in the declaratory judgment proceedings discussed in this matter. Further, Respondent's testimony concerning these quitclaims was misleading. He also brought a harassing defamation

18

action against the complainants in this matter after they filed a civil RICO lawsuit against him. Such misconduct is similar to that found in *Harris*, *Pinkston* and *Simpson* and falls squarely within ABA Standard 6.11. As such, this misconduct warrants a sanction ranging from disbarment to permanent disbarment. Because of the mitigating factors present, particularly the lack of prior discipline, the Board recommends that the Respondent be disbarred.

Both respondent and the ODC filed objections to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

At the outset, we point out that it is not our purpose in these disciplinary proceedings to pass on the legal validity or efficacy of the procedures employed by respondent. Such matters properly fall within the province of the civil courts, and we express no opinion on these legal issues in the exercise of our disciplinary jurisdiction. Rather, the sole issue presented for our consideration is whether respondent's actions run afoul of the applicable ethical rules.

It is undisputed that respondent created three fictitious quitclaim deeds purporting to transfer the properties from his closely held corporation, Hickory

Glade, Inc., to himself. Respondent then forged the name of Timothy Dunaway, his Hickory Glade co-owner, to the deeds as seller without Mr. Dunaway's knowledge or consent. Respondent affixed his own signature to the documents as buyer. No money changed hands in the transfers, and respondent acknowledges that Hickory Glade possessed absolutely no ownership interest in the properties that the deeds purported to convey. Respondent then filed these quitclaim deeds into the public records. When he later filed his motions for default judgments, he did not advise the court of the fact that he had drafted the quitclaim deeds himself or that he assumed the role of both seller and purchaser in connection with the quitclaim deeds. Respondent also misrepresented to the district court – both in pleadings and in his testimony – that he "acquired an interest" through the quitclaim deeds. These deeds then created a cloud on the title which resulted in the later federal court litigation.

In argument to this court, respondent concedes that the quitclaim deeds may have been procedurally defective, but argues they are not inherently fraudulent. In support, he points out that a quitclaim simply transfers whatever ownership interest the grantor has in the property, which may be no ownership at all. He further asserts that any procedural defects in the quitclaim deeds did not create the cloud on the titles, because the same cloud would have been created regardless of whether the quitclaims were procedurally correct.

However, as the board pointed out, the very fact the quitclaims were unnecessary demonstrates that respondent must have created them with the fraudulent purpose of making his ownership claim appear stronger to the court. In both his testimony and his brief, respondent has never provided any compelling reason why he created the quitclaims, other than his assertion that they provided evidence of civil possession (which he admits he believed was unnecessary in light of his physical possession) and his after-the-fact justification that they gave the owners additional notice due to their recordation in the public records. At the very

20

least, the quitclaim deeds gave an appearance of legitimacy to respondent's claims when he filed his motions for default judgments, and he did nothing to apprise the court of the fact that these quitclaim deeds were meaningless.

Rule 3.3 of the Rules of Professional Conduct, entitled "Candor Toward the Tribunal," provides that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer" or "offer evidence that the lawyer knows to be false." As explained in the comments to ABA Model Rule 3.3, "[t]his Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process."

Respondent's act of filing forged quitclaim deeds into the public records and not apprising the trial court of these defective deeds at the time he sought his declaratory judgments had the effect of undermining the integrity of the adjudicative process, thereby creating harm to both the legal system and the true owners of the property. As aptly stated by the disciplinary board, "[r]espondent carefully crafted the quitclaims to conceal the self-dealing nature of the transactions and perpetrate the false notion that he had acquired an interest in the subject properties." The board correctly observed that the harm from these actions was compounded by the fact the judges presiding over two of these matters "had only the record and Respondent's testimony upon which to rely, since the proceeding was in the nature of a confirmation."

These undisputed facts lead to the inescapable conclusion that respondent's conduct contravenes Rules 3.3(a)(1), 3.3(a)(3), and 8.4(c) of the Rules of Professional Conduct. Having found ethical misconduct, we must now pass on the appropriate sanction.

In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the

integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

We find that respondent violated duties owed to the legal system, the public, and the profession. His actions were knowing and intentional.

Given the highly unusual facts of this case, our jurisprudence provides little precise guidance in fashioning an appropriate sanction. However, as indicated by the case law cited by the board, sanctions imposed in cases involving misrepresentation to a tribunal generally range from lengthy suspensions to disbarment, with emphasis on the aggravating and mitigating factors presented.

In aggravation, we find the record supports the following factors: a dishonest or selfish motive, multiple offenses, willful obstruction of the disciplinary process, and refusal to acknowledge the wrongful nature of the misconduct. Additionally, respondent's pointless act of recording the quitclaim deeds placed clouds on the titles of the actual purchasers and caused them actual harm.

In mitigation, we recognize respondent has had an unblemished disciplinary record since his admission to the bar in 1978. Additionally, he has been subject to the imposition of other penalties or sanctions arising from the federal litigation. Although not strictly a mitigating factor, we also recognize respondent's conduct was motivated, at least in part, by a desire to place the properties back in commence, and his actions had the salutary effect of returning these properties to the parish tax rolls.

Considering all the facts of this unique case in conjunction with the aggravating and mitigating factors, we find the appropriate sanction for respondent's misconduct is a two-year suspension from the practice of law. Our leniency in

22

declining to impose the harsher sanction recommended by the board results in part from the novel issues presented in these proceedings, and the lack of clear jurisprudential guidance for the bar. However, we take this opportunity to caution the members of our bar that we place great emphasis on the duty of full candor toward a tribunal, which is essential for our legal system to function properly and fairly. Any breach of that duty in the future may be grounds for significant disciplinary sanctions.

## DECREE

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that William Magee, Louisiana Bar Roll number 8859, be and he hereby is suspended from the practice of law for a period of two years. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

01/30/19

# SUPREME COURT OF LOUISIANA

## NO. 18-B-0383

## IN RE: WILLIAM MAGEE

*ATTORNEY DISCIPLINARY PROCEEDINGS*

**WEIMER, J.**, concurring in part and dissenting in part.

I agree with the majority's assessment of the respondent's misconduct, but disagree with the sanction. Although the majority recognizes in mitigation that the respondent "has had an unblemished disciplinary record since his admission to the bar in 1978," I note the respondent has also performed extensive pro bono work. While not technically a factor recognized in the ABA's *Standards for Imposing Lawyer Sanctions*, our hearing committees have sometimes found pro bono work to be worthy of this court's consideration as a mitigating factor. See, e.g., **In re Kerth**, 03-1811, p. 9 (La. 10/31/03), 865 So.2d 21, 26. Here, I find the respondent's pro bono record significant and commendable, and hence indicative of favorable "character and reputation," which are recognized as mitigating factors in the ABA's *Standards for Imposing Lawyer Sanctions*. I believe a one-year suspension would adequately serve the purposes of the disciplinary system.

**SUPREME COURT OF LOUISIANA**

**No. 2018-B-383**

**IN RE:  WILLIAM MAGEE**

**ATTORNEY DISCIPLINARY PROCEEDING**

**Hughes, J., dissents.**

I respectfully dissent from the two year suspension imposed and would order a suspension of one year and one day.